Matter of M. F. (2006 NY Slip Op 52385(U))

[*1]

Matter of M. F.

2006 NY Slip Op 52385(U) [14 Misc 3d 1202(A)]

Decided on December 11, 2006

Family Court, Bronx County

Malave-Gonzalez, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on December 11, 2006

Family Court, Bronx County
In the Matter of M. F. A Person Alleged to be a Juvenile Delinquent, Respondent.
E-XXXX/06

Nelida Malave-Gonzalez, J.

PROCEDURAL HISTORY
Respondent, M.F., is charged with Murder in the Second Degree (P.L. § 125.25(2)). At the time of the incident, respondent was 13 years old. This case stems from the death of respondent's newborn baby, Angel.On January 14, 2005, the deceased was found inside a paper bag on the steps of church. Respondent was arraigned in Bronx Criminal Court for the murder of the deceased on March 21, 2005, the case was removed to Bronx Family Court where respondent made her initial appearance on March 22, 2005. The fact finding began on March 7, 2006 and concluded on November 30, 2006.[FN1]

STATEMENT OF THE FACTS
On it's direct case, the presentment agency, represented by the Office of the Bronx District Attorney, put forth several witnesses. A.M.P. (respondent's friend), K. P. (A.M.P's sister), Emergency Medical Technician and Paramedic Tobayi Howton, Detective Iris Bresciani, Detective Joseph Noya, Detective Robert Grant, Medical Examiner Dr. Michelle Slone and [*2]L.B., the father of the deceased baby.[FN2]
A.M.P., now in the 9th grade testified that she and the respondent have known each other since 6th grade. Respondent told A.M.P. that she was pregnant in the Spring of 2004. According to A.M.P., the respondent told her she was going to have an abortion.A.M.P. testified that in the Fall of 2004, the respondent told her that she miscarried. (5/31/2006 Tr. pg. 7, ln. 19). In January 2005, A.M.P. was unsure if the respondent was still pregnant, however at the beginning of their 8th grade school year, A.M.P. observed that respondent had "a belly." (3/7/06 Tr. pg 8, ln. 8). On January 14, 2005, both the respondent and A.M.P. went on an 8th grade class trip to the 161st street movie theater in Bronx County. Although the respondent and A.M.P. had a disagreement in Fall of 2004 and stopped speaking to each other, on January 14, 2005 they began speaking to each other again. (5/31/06 Tr. Pg. 12, ln. 17-19). Respondent told A.M.P. that she gave birth to the deceased at 4:30 a.m., wrapped him in t-shirts, put the deceased down, fainted and when she woke up the baby was out of the window. (5/31/2006 Tr. pg. 13, ln. 18-23). The respondent then borrowed another friend's cell phone and called L.B. (5/31/06 Tr. pg. 15, ln. 22- pg. 16, ln 7). After making the phone call, the respondent and A.M.P. went to get something to eat and to see a movie. (5/31/06 Tr. pg. 16, ln. 22-23). After the class trip, A.M.P. and the respondent walked to her apartment building where they met L.B.A.M.P. heard the respondent say that she did not have the baby anymore and then pointed to the window next to the staircase. (5/31/06 Tr. pg. 18, ln. 7-8). Looking out of the window, A.M.P. observed a baby lying on the concrete floor "the top half of him was covered with a black t-shirt and the placenta and umbilical cord right next to him." (5/31/06 Tr. pg. 19, ln. 15-18). The baby did not appear to be moving. The respondent went inside her apartment despite A.M.P.'s efforts to speak to her about what she observed. A.M.P. and L.B. went back to see if the baby was alive. The baby was not moving or crying. (5/31/06 Tr. pg. 25, ln. 17-21). When A.M.P. called the respondent and requested to go up to her apartment to speak with respondent's mother, respondent said no and hung up the phone. A.M.P also called her sister R.P. who came over to the respondent's building. A.M.P. called the respondent again to request entry into her apartment with A.M.P.'s mother.[FN3] Respondent refused. A.M.P. went to the store with L.B and sister K.P. where they purchased a "happy birthday" gift bag and gloves. A.M.P., K.P., L.B. and one of his friends went back to the baby and placed him in the happy birthday bag. They then took a cab to a small white church in the vicinity of 183rd street and Washington Ave. and left the baby in the front. A.M.P. did not call the police at any time.
K.P. testified that at approximately 4:30 p.m. on January 14, 2005, she spoke with the respondent over the phone who confirmed the circumstances of the baby's birth as told by A.M.P. The respondent further indicated that although she was scared her mother would find out about the baby she did not throw it out of the window. (5/31/06 Tr. pg. 48, ln. 18-22). K.P. then passed the phone to L.B., who started speaking with the respondent. K.P. testified that she was present when the "happy birthday" bag and gloves were purchased, when the baby was placed inside [*3]said bag then placed on the steps of the church near Washington Ave. K.P. did not call the police at any time.
L.B. testified that he and the respondent began their relationship December 24, 2001. He described the relationship to involve seeing each other at school, at a church program and in the respondent's home. L.B. conceded a sexual relationship with the respondent as of April 4, 2004. (8/17/06 Tr. pg. 11, ln. 4-8). L.B. described the respondent as a happy, playful, nice person during the course of the relationship and throughout the pregnancy. (8/17/06 Tr. pg. 11, ln 2-3; pg. 18, ln. 6-18). L.B. conceded on cross-examination that there were times when the respondent was clearly unhappy (8/17/06 Tr. pg. 45, ln. 14-16). L.B. did not think that respondent's mother was aware of the sexual nature of the relationship as he and the respondent engaged in such conduct when her mother was not home. (8/17/06 Tr. pg. 11-12). L.B. believed the respondent to be pregnant throughout the spring and summer of 2004, however, at some point the respondent told L.B. that she was no longer pregnant. (8/17/06 Tr. pg. 16, ln. 19-22). In January of 2005, L.B. believed the respondent was still pregnant. On January 14, 2005, L.B. arranged to meet the respondent after school. At approximately 3:45 p.m. he saw her walking with A.M.P. and the respondent informed L.B. that she had given birth. L.B. then touched the respondent's stomach which he acknowledged felt different than the times he had touched it during her pregnancy. The respondent then directed L.B. to look out the window where he observed what appeared to be a "wet teddy bear" and a placenta. (8/17/06 Tr. pg. 24, ln. 13-24). L.B. then proceeded outside to the backyard where he saw the deceased lying face down surrounded by t-shirts. He observed the baby to be cold and not breathing. (8/17/06 Tr. pg. 28, ln. 8-12). L.B. then went to A.M.P.'s house where he called the respondent. He then went to the ninety-nine cent store, purchased a gift bag and gloves, returned to the building and removed the baby. L.B., his friend, A.M.P. and K.P. took a cab over to the church where he left the baby. L.B. gave a statement to the police on January 15, 2005 detailing his involvement and his sexual relationship with a then 12 year old respondent. (8/17/06 Tr. pg. 47, ln. 20-22). L.B. acknowledged that he was promised immunity from prosecution as to the "conception, birth, and death of the baby" (8/17/06 Tr. pg. 48, ln. 19-25 ; Tr. pg. 49, ln.1).
Emergency Medical Technician and paramedic Tobayi Howton testified that on January 14, 2005 he was working the overnight shift with his partner. At approximately 8:24 p.m., EMT Howton responded to an assignment at East 183rd Street. Upon arrival at the Prince of Baptist Church located at183rd Street between Park Ave. and Washington Ave., EMT Howton observed a happy birthday bag. Looking into the bag, EMT Howton observed a limb that he determined to be flesh and called the police. (6/1/06 Tr. pg. 12). EMT Howton observed the weather conditions to be 14 degrees and pitch black. Once the bag was brought into the ambulance, EMT Howton observed a baby wrapped in t-shirts with his umbilical cord and placenta intact. He unwrapped the baby and checked the umbilical cord for a pulse, there was nothing. (6/1/06 Tr. pg. 14, ln. 4-11). The baby's temperature was equal to that of the temperature outdoors and he had cranial facial trauma with blood around the nose and mouth. (6/1/06 Tr. pg. 15, ln. 11-19). EMT Howton also hooked up the baby to a cardiac monitor to determine electrical activity, there was none. (6/1/06 Tr. pg. 17, ln. 17-22). EMT Howton conceded that he had no personal knowledge of the time of death, or infliction of the fatal injury. (6/1/06 Tr. pg. 25-26). However, based on his observations and tests, EMT Howton determined that the baby was dead and pronounced the time of death to be 8:28 p.m. (Tr. pg. 18, ln. 14). EMT Howton transported [*4]the deceased to the morgue.
NYPD Detective Iris Bresciani, of the 48th precinct was assigned to investigate this case on January 14, 2005. Det. Bresciani arrived at the Prince of Baptist Church after the deceased had been removed from the steps. Det. Bresciani had the opportunity to view the deceased inside the ambulance. On January 15, 2005, Det. Bresciani attended the autopsy of the deceased where the medical examiner determined the cause of death to be blunt force trauma. As a result of this information, Det. Bresciani declared this case a homicide. (6/1/06 Tr. pg. 35, ln. 10-11, pg. 36, ln. 10-11).On January 15, 2005, J. L. went to the 48th precinct and spoke with Det. Bresciani. J. L.[FN4] relayed information that led Det. Brecsiani to A.M.P who informed the detective of the respondent's address. Det. Bresciani along with Det. Grant, Det. Morales and Lieutenant Rafity entered the respondent's apartment on the consent of her mother.[FN5] Inside the apartment, Det. Bresciani observed what appeared to be blood on the respondent's bedroom windowsill. The respondent and her mother agreed to accompany the detectives to the 48th precinct. The respondent and her mother were informed of respondent's Miranda rights which were waived and respondent gave a written statement.[FN6] Respondent was transferred to the St. Barnabas Hosptial for psychiatric stabilization and then to the psychiatric facility where she remained throughout the pendency of this case. (6/1/06 Tr. pg. 111, ln. 17-24). On January 19, 2005, pursuant to valid search warrant Det. Bresciani entered the respondent's apartment and again observed what appeared to be blood on the windowsill and the window guard on the right bedroom window. Det. Bresciani observed a "stopper" on the window which prevented it from opening all the way. Det. Bresciani also went out into the alleyway and observed the cement floor underneath the respondent's bedroom window. (6/1/06 Tr. pg. 94-95). The window guard was removed, vouchered as evidence and taken to the medical examiner. Det. Bresciani arrested the respondent on March 22, 2005.
Detective Joseph Noya of the Crime Scene Unit was assigned the instant case on January 19, 2005. Det. Noya went to respondent's home along with Det. Steiner, Det. Bresciani, Det. Morales and the medical examiner who performed the autopsy on the deceased. Respondent's mother and father were also present. Det. Noya took photographs and measurements of the south window and window guard in the respondent's bedroom. He also made a rough sketch of the window guard. Det. Noya then called emergency services to remove the window guard which was then turned over to the medical examiner. (6/6/06 Tr. pg. 18, ln. 1-8; pg. 19, ln. 11-25). A computer generated sketch compiled from the rough draft that Det. Noya created illustrates that the measurements of the left side of the window guard to be 4½", 4½", 4½" and 4½" from the bottom to the top . The center vertical measurements from bottom to top [*5]measured 4", 4", 4" with the top measurement equaling 2". The right vertical measurements were 4½", 4½", 4½" and 3" from top to bottom respectively. Det. Noya also measured the maximum vertical distance the window opened from the bottom ledge to the "safety stop" as 1' and 4" . (6/6/06 Tr. pg. 22-23).
Detective Robert Grant of the Bronx Homicide Task Force, accompanied Det. Morales, Det. Bresiciani and who he believed to be Sgt. Mancini to the respondent's home on January 14, 2005. On cross-examination, Det. Grant conceded that in fact, approximately seven officers accompanied him inside of the respondent's home. (6/6/06 Tr. pg. 63-65). The detectives entered the home with the consent of the respondent's mother. (6/6/06 Tr. pg. 35, ln. 2-6). Det. Grant observed red stuff on the window sill and a towel with red stuff on the floor or bed in the respondent's bedroom. At approximately 6:00p.m., the respondent and her mother accompanied the detectives back to the 48th precinct. Respondent did not have a choice in accompanying Det. Grant to the precinct. (6/6/06 Tr. pg. 65, ln. 11-25). Respondent and her mother were taken to the designated juvenile room where respondent was administered her Miranda warnings and her mother informed of the same at approximately 10:00 p.m. (6//6/06 Tr. pg. 45, ln. 2) While respondent and her mother were waiting inside the room Det. Grant returned to respondent's home. A photograph taken in Det. Grant's presence by the Crime Scene Unit on January 15, 2005 was entered into evidence to illustrate the alleyway underneath the respondent's window and the officer's observation of the alleyway. Det. Grant observed the alleyway to be made of concrete and further observed a red, sticky substance on the concrete. (6/6/06 Tr. pg. 50-51) . Upon his return to the 48th precinct, Det. Grant administered Miranda warnings and questioned the respondent. Respondent's oral statement was reduced to writing by Det. Morales. Respondent also made a videotaped statement approximately twenty minutes after she gave her oral statement. (6/6/06 Tr. pg. 55, ln. 1-11). The statement was taped on January 16, 2005 at approximately 1:00 a.m. (6/6/06 Tr. pg 61, ln.13-16). The respondent's videotaped statement was then played in open court and entered into evidence. 
WAS THE BABY BORN ALIVE?
As a pre-requisite to determining the ultimate question in this fact-finding, the Court is presented with the preliminary question of whether the baby was born alive. If in fact the baby was still-born, having died in the womb or during child birth there is no need to reach the ultimate question of whether the respondent caused his murder by depraved indifference. See generally, People v. Dlugash, 41 NY2d 725 (1977). To this end, the Court looks to the testimony of the two relevant witnesses, Medical Examiner, Dr. Michelle Slone and the respondent's Consulting Forensic Pathologist, Dr. Edward McDonough.
Dr. Slone, who testified as an expert witness, performed an autopsy on January 15, 2005 the results of which were recorded her report which was entered into evidence. Dr. Slone recorded the body of the deceased as approximately 4½ lbs. in weight and 1½' in length. The circumference of the deceased's head, estimated due to distortion, was recorded as 31 centimeters or 12.2 inches and the diameter as 3 and 7/8ths of an inch. (7/6/06 Tr. pg. 20, ln. 7; 8/16/06 Tr. pg. 21, ln. 20-25). Dr. Slone opined that the deceased had a gestational age of [*6]approximately 35-38 weeks. (7/6/06 Tr. pg. 21, ln. 6-7).[FN7] Dr. Slone performed a radiograph which showed a significant amount of air in the gastrointestinal tract and floated the deceased's lungs in water which assisted in her determination that the deceased was in fact born alive. (7/6/06 Tr. pg. 35, ln. 11-22). Although admittedly stating, she could not say the exact time or place of death. (8/16/06 Tr. pg. 11, ln. 1-10). Dr. Slone also conceded that air in the lungs is equivocal with someone trying to resuscitate the baby. (8/16/06 Tr. pg. 14, ln. 16-19).
Dr. Edward McDonough, Deputy Chief Medical Examiner for the State of Connecticut testified as an expert witness on behalf of the respondent. Dr. McDonough, had the opportunity to review the police reports generated in this case, the medical records and autopsy report of the deceased. Additionally, Dr. McDonough was present in the courtroom while Dr. Slone testified for the presentment agency. Dr. McDonough opined that there are several ways to determine if a baby was born alive. Food in the belly and post-natal activity are some indicators, however there is no "good science" to resolve this question with certainty. However, Dr. McDonough stated that a reliable source would be necessary to determine the accuracy of post-natal activity. (9/19/06 Tr. pg. 30, ln. 22-25). While Dr. McDonough is familiar with the hydrostatic test that Dr. Slone performed through floating the deceased's lungs in water as indication that the deceased was in fact born alive and breathing on his own (9/1/9/06 Tr. pg. 28, ln. 11-13), other factors such as bacteria, gas, resuscitation, and the birth process may contribute to the result of the lungs actually floating. (9/19/06 Tr. pg. 18 - 19). A similar result would be shown in any radiological tests such as an x-ray based on the aforementioned factors. Further, the hemorrhages in the deceased skull are also not indicative that the baby was born alive. The injuries if sustained peri-mortem, as depicted in the autopsy report, would look the same. (9/19/06 Tr. pg. 22). This would occur even if the deceased had died without blunt force trauma before going out the window. (9/16/06 Tr. pg. 22). In sum, Dr. McDonough opined that it is not conclusive that the deceased was in fact born alive.
Respondent's own account of the moments after the baby was born presents additional facts that establishes the baby was born alive. Respondent's statements to the police, admitted into evidence, depicts that the baby moved his arms and legs and looked at her immediately after birth. The Court does not adopt Dr. McDonough's theory that the respondent may not be a credible reporter in this aspect nor does this Court adopt Dr. McDonough's interpretation of the hydrostatic and radiological tests on the deceased. Thus, this Court answers the preliminary question posed in this case in the affirmative and now turns to the most pertinent issues, the cause of death and whether the respondent committed the act of depraved indifference murder.
Dr. Slone's observations of the deceased's body included the attached umbilical cord and placenta with dirt over the face, hair, torso and extremities. Dr. Slone also observed the left side of the deceased's face to be flattened, with palpable skull fractures on both sides of the head, a swollen and blue bruise above the right eye with an adjacent scratch and underlying liquid. The deceased also had a scratch behind the right ear with linear scratches over the back of the lower neck. During the autopsy, Dr. Slone opened the deceased's scalp where she observed a diffuse amount of subscalpular and subgaleal hemorrage, vertical fractures on the back of the head with epidural and subdural bleeding. Dr. Slone observed a radiating fracture on the skull of the [*7]deceased which she surmised was the result of blunt trauma; not trauma due to vaginal birth. (7/6/06 Tr. pg. 24, ln. 23-25; Tr. pg. 26, ln. 8-10). Likewise with the brain injury which manifested in bruising. The deceased's torso reflected a blue bruise over the front side of the chest, a subcutaneous hemorrhage over the right side of the back, the right shoulder and the right side of the lower back. There were fractures of the right fifth through seventh ribs, blood around the spinal cord that Dr. Slone equated as the result of the trauma (7/6/06 Tr. pg. 34, ln. 24 - pg. 35, ln. 2). Dr. Slone detected a small amount of the anti-depressants Amitriptyline and Nortriptyline in the toxicology report of the deceased's brain. (7/6/06 Tr. pg. 36, ln. 22- pg. 37, ln. 1). However, upon re-analyzation of the toxicology report there was no Amitriptyline detected. (7/6/06 Tr. pg. 39, ln. 6-11). Dr. Slone testified that it would be impossible for a newborn baby to roll over, crawl, walk or climb. She further thought it unlikely that the placenta slipped through the window and pulled the baby out since the placenta weighed three and one half pounds less than the baby. (7/6/06 Tr. pg. 50, ln. 17-18). Dr. Slone further found it unlikely that this baby could have fallen through the window on it's own based on the diameter of the head, the torso, extremities, the three t-shirts he was wrapped in, gravity and the limited space between the window guards. Dr. Slone took her own measurements of the window guards which she estimated at 4 and 1/4 inches with the bottom portion of the window guard which is the space from the window frame to the first bar on the window guard recorded less than 4 and 1/4 inches. On January 19, 2005, Dr. Slone went to the respondent's apartment where she observed a peg which limited the range that the window could open. She also observed the window guard which was still in the window as well as the concrete outside of the window. Although admitting that vaginal birth allows for a newborn's head to squeeze through a space much smaller than itself, Dr. Slone concluded to a reasonable degree of medical certainty that the cause of death to the deceased was blunt impact of the head and torso with skull and rib fractures. (8/16/06 Tr. pg. 22, ln. 24 - pg. 23, ln. 2). The fatal injuries were consistent with the deceased falling from a third story window, specifically the respondent's window to concrete and skull fractures being consistent with the head being squeezed through an area smaller than itself. (7/6/06 Tr. pg. 39, ln. 19 - pg. 42, ln.12).
Dr. McDonough opined that the skull fractures of the deceased are consistent with the deceased falling from the window to the ground three stories below and not due to the deceased's head being squeezed through a space smaller than itself. Dr. McDonough based his conclusions on the facts that deceased's head was just squeezed through a space smaller than itself during the birth process and the skull had not yet fused. (9/19/06 Tr. pg. 24 - 25, ln. 7).
 Conclusions of Law & Analysis
A person is guilty of murder in the second degree when "under circumstances evincing a depraved indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby caused the death of another. P.L. § 125.25(2).
Under People v. Register, 60 NY2d 270 (1983), a crime charged containing the element of "depraved indifference" did not address the defendant's mens rea but rather the "factual setting [*8]in which the conduct must occur."[FN8] In December 2005, the New York State Court of Appeals decided one of the first cases which would ultimately lead to the reversal of Register. People v Suarez, 6 NY3d 202 (2005), which included the companion case of People v. McPherson, redefined what constitutes depraved indifference murder. In Suarez, during an argument, the defendant stabbed his girlfriend with a knife and then fled the scene where the victim ultimately bled to death. In Mcpherson, the defendant stabbed her boyfriend with a knife, called 911 but left the scene before the ambulance arrived. The victim bled to death at the hospital. Distinguishing depraved indifference murder from intentional murder and intentional manslaughter and in turn paving the road to establish depraved indifference as a culpable mental state, the Court of Appeals intimated that one can not intend to kill another person and in the same breath be indifferent as to whether that person lives or dies. "A defendant who intends to injure or kill a person cannot be generally said to be indifferent' depravedly or otherwise to the fate of that person." Suarez at 211. Further, depraved indifference murder is distinguished from reckless manslaughter because of the additional requirement that an independent finding occur as to the circumstances evincing depraved indifference murder, regardless of whether the risk of death was grave or substantial. Suarez, 213-214. Both Suarez' and McPherson's convictions of depraved indifference murder were overturned as the acts while intentional and reckless, respectively, did not evince the requisite mental state of "utter depravity, uncommon brutality and inhuman cruelty". Suarez at 216.
In People v. Feingold, 7 NY3d 288 (2006) the Court examined depraved indifference as a culpable mental state in light of Suarez.In Feingold, the defendant attempted suicide by turning off the pilot light in his stove. The gas from the stove and a spark from the refrigerator compressor caused an explosion and damaged many apartments although no one other than the defendant was injured. The lower court, relying on Register, convicted the respondent of reckless endangerment in the first degree which states in pertinent part "when under circumstances evincing a depraved indifference to human life, he recklessly creates a grave risk of death to another person." P.L. § 120.25. (emphasis added). Bound by Register, the lower court concluded that although the facts of the case did not show that the defendant's mind state at the time he committed the crime was that of "depraved indifference" towards other persons, nonetheless, the acts in and of themselves were in a factual setting that evinced a reckless act. Thus, applying Register, the defendant had to be found guilty. The Court of Appeals realizing the quandary presented by the lower court's decision modified the conviction to reckless endangerment in the second degree which lacks the element of "depraved indifference."[FN9] The Court of Appeals reasoned that the defendant did not evince the requisite culpable mental state for depraved indifference. Although the act of turning on the [*9]gas may have created a danger to others, the defendant's mental state was focused on ending his own life and not in creating a danger to anyone else.[FN10]
In Suarez, the Court of Appeals reiterated various instances in which a one on one killing may be considered depraved indifference murder. In all three instances, the defendant does not possess the intent to kill. First, where a defendant abandons a helpless and vulnerable victim. Second, where there is a prolonged and untimely fatal course of conduct that results in the death of a particularly vulnerable victim. And finally, where reckless acts are superceded by a defendant's depraved mental state. Recently, an appellate court explored two of the three aforementioned instances. People v. Maddox, 31 AD3d 970 (3rd Dept. 2006), involved a vulnerable victim similarly situated to the deceased in the instant case. The deceased in Maddox died from "shaken baby syndrome". The defendant hit the infant, repeatedly shook the infant and threw her headfirst into a bassinet. The defendant did not call an ambulance and the infant subsequently died. Additionally, on a previous occasion an independent witness observed the defendant violently shake the infant and throw her into a stroller. Medical evidence established an abusive course of conduct that was inflicted prior to the fatal incident as well as recent injuries that caused the untimely death of the infant. The Court reasoned that the defendant's mental state was not to seriously injure nor kill the infant but to inflict his version of discipline. Thus, the "prolonged period of time" of the infant's abuse, the defendant's efforts to blame the infant's fatal injuries on an accidental fall and not calling for immediate assistance evinced that he was not only aware of the grave risk of death but also possessed a "depraved indifference to the infant's plight." As such, the defendant's conviction of depraved indifference murder was upheld.
This case does not exhibit the additional facts of a brutal, prolonged torturous fatal course of conduct, as seen in Maddox nor reckless conduct superceded by an independent depraved indifference to human life as seen in People v. Roe, (citation omitted; cf, Suarez supra;), thus, this Court focuses on the vulnerability of the victim in the instant case and the circumstances that resulted in his death. "When the defendant intends neither to seriously injure, nor to kill, but nevertheless abandons a helpless and vulnerable victim in circumstances where the victim is highly likely to die, the defendants utter callousness to the victims mortal plight-arising from a situation created by the defendant properly establishes depraved indifference murder." Suarez at 212.At the outset it should be noted that, Respondent's actions on January 15, 2005 the day after the baby was born, although summarized in this decision and by some definition might be unfeeling and cruel are not considered in determining her culpable mental state at the time the baby went out the window. Although the defendant's failure to call for assistance of the infant in Maddox may have been considered a factor in determining whether that defendant possessed the requisite mental state of depraved indifference, this Court wholly adopts the holdings of the Court of Appeals as intimated in Suarez and People v. Mancini, 7 NY3d 767 (2006), "irrespective of what the actor does or does not do after inflicting the fatal injury, depraved indifference murder is not made out unless the core statutory requirement of [*10]depraved indifference is established". Thus, the testimonies of K.P., L.B. and A.M.P. are only included in this decision to create a time-line as to how the deceased was discovered by the EMT worker and ultimately connected to this respondent.
The instant case is the first case after Suarez, Feingold and their progeny to involve a juvenile respondent and thus this Court must carefully consider the age as well as the mental state of the respondent. Conversely, a newborn baby is a particularly vulnerable victim, helpless in every sense of the word. When born without medical assistance, a baby relies solely on it's mother to care for it until proper medical attention can be given. In the opinion of many, the mere fact that the deceased was pushed out of a window three stories above ground to a concrete floor may be considered an intentional act for which there can be no other result but an intentional death. This Court is reluctant to reach that conclusion. The respondent in this case was a teenager, who had turned thirteen years old approximately one month prior to this fatal incident. The respondent had gone to great lengths to secret her pregnancy. She did not tell her parents, did not seek prenatal care, and informed both her friend, A.M.P. and the baby's father, L.B. that she was no longer pregnant. When first presented with the unexpected yet imminent fact of giving birth to the baby, who was born two months early, the respondent did not seek assistance. The respondent gave birth to the baby, in secret, on the floor of her bedroom. The respondent, a thirteen year old girl, who had kept this secret for approximately seven months continued to keep the birth of the baby a secret and without the intent to kill, pushed and released the deceased through the window guard. When questioned in her videotaped statement, the respondent was asked "When you let him go, you actually let him fall out the window?" The respondent answered, "I didn't want to let the baby go out the window, but yeah." While this Court can accept that it was not the intent of the respondent to kill the deceased, this Court rejects respondent's assertion that the deceased "slipped" through the window guards. The window guards in comparison to the measurements of the deceased's head, the weight of the placenta in comparison to the weight of the deceased's body and the respondent's own account as memorialized in her videotaped statement that she wrapped the deceased in at least three t-shirts after giving birth which were found with the deceased, negates any probability that the deceased "accidently went out the window" due to the respondent's reckless act of bringing the baby to the window as she attempted to open it to get some air. This court finds that the respondent's mens rea of depraved indifference to human life was evidenced in her overwhelming desire to not be discovered as pregnant and to further hide the birth of the baby which resulted in the unfortunate death of the newborn. The respondent did not want to kill or injure the baby, in fact this Court concludes that she did not care one way or the other. Additionally, the respondent abandoned the most vulnerable victim, her newborn, in circumstances that to a person not thirteen, with the pressures of a strict household and the embarrassment of a teenage pregnancy would have been perceived as conditions detrimental to the newborn's existence. The respondent in an attempt to secret the birth of the baby, evidenced a "utter depravity, uncommon brutality and inhuman cruelty" towards the life of the newborn who could not fend for himself.As such, this Court finds that the presentment agency has met it's burden of proof beyond a reasonable doubt as to the only count of the petition, murder in the second degree.
RESPONDENT'S AFFIRMATIVE DEFENSE
This Court now turns to the respondent's affirmative defense of mental disease or defect which [*11]may in fact negate the essential element of a mens rea evidencing a depraved indifference to human life. See generally, People v. Coates, 64 AD2d 1 (1978).
The respondent served notice pursuant to F.C.A § 335.1 of the intent to proffer psychiatric evidence to establish the affirmative defense of mental disease or defect. Pursuant to P.L. § 25.00, the defendant has the burden of establishing an affirmative defense by a preponderance of the evidence. A preponderance of the evidence means the greater part of the believable and reliable evidence . . . [that is] of such a convincing quality as to outweigh any evidence to the contrary. CJI2d[NY] Mental Disease or Defect.
P.L. § 40.15 states in pertinent part . . .
"it is an affirmative defense that when the defendant engaged in the proscribed conduct, he lacked criminal responsibility by reason of mental disease or defect. Such lack of criminal responsibility means that at the time of such conduct, as a result of mental disease or defect, he lacked substantial capacity to know or appreciate either:
(1) The nature and consequence of such conduct; or
(2) That such conduct was wrong.
Dr. Stephen Billick, testified as an expert witness in the fields of Child and Adolescent Psychiatry, Forensic Psychiatry and General Psychiatry on the respondent's direct case. Dr. Billick interviewed and evaluated the respondent on October 5, 2005 for two hours.[FN11]Respondent was interviewed at the psychiatric facility where she was placed after her initial appearance. Prior to interviewing the respondent, Dr. Billick reviewed, inter alia, the respondent's statements to the police, her psychiatric records, police reports and school records. The respondent was questioned about school and her family life. As Dr. Billick began to question the respondent about the relevant facts surrounding the birth of the deceased, the interview ended abruptly when the respondent became overwhelmed, non-responsive and ran from the room. (8/17/06 Tr. pg. 98). Dr. Billick did not meet with the respondent again. Based on the information ascertained from the respondent during the interview, Dr. Billick diagnosed the respondent as suffering from a mental illness. Specifically, "depression, a dissociative state and . . . delirium." (8/17/06 Tr. pg. 99, ln. 22-23).Dr. Billick's diagnosis of a "depersonalization disorder" was based on the traumatic experience of the childbirth and the respondent's verbalization that she "felt as if she was across the room sort of watching herself do these things. . ." (8/17/06 Tr. pg 115, ln. 3-7). However, on cross examination, Dr. Billick conceded that the persistent or recurrent criteria required by the DSM-IV-TR [FN12] for a Depersonalization Disorder was not communicated to him by the respondent. (9/22/06 Tr. pg. 44, ln. 7-10). Dr. Billick's October 2005 diagnosis of a "major depressive disorder" was based on respondent's prior diagnosis with the aforementioned which was triggered by her pregnancy and her desire to keep it a secret. On cross-examination, Dr. Billick acknowledged that he could not be certain that this was her state of mind at the time of the [*12]incident based on the requirements of the DSM-IV-TR. (8/17/06 Tr.139-156). Further, he conceded that no other doctor who treated the respondent subsequent to the birth of the baby had diagnosed her with a major depressive disorder. (8/17/06 Tr. pg. 133, ln. 12-17). Dr. Billick opined that the "overriding" defect effecting the respondent's mental state was "organic delirium". (8/17/06 Tr. pg. 166, ln. 1-3). "It's very important to understand that when you have a derangement of the brain with an organic delirium that . . . makes it impossible for the other diagnosis to play the kind of role that they had before and actually becomes the primary focus of treatment." (9/29/06 Tr. pg. 30, ln. 16-22). Organic delirium occurs when the brain becomes disorganized due to chemical changes. These changes can be shown through various factors. In the respondent's case, the chemical changes were evidenced by her hematocrit level which when taken forty-eight hours after the incident was twenty-nine.[FN13] Respondent also had an atrial septal defect of the heart.[FN14] Dr. Billick opined that the respondent's heart defect contributed to her organic delirium as childbirth is a very strenuous activity. (8/17/06 Tr. pg. 106-108). Childbirth also results in an enormous amount of [blood] fluid loss, which Dr. Billick acknowledged was unknown in the respondent's case. The respondent's organic delirium manifested in the respondent not being able to lay down memories and thus she is not a reliable reporter (9/29/06 pg. 35), although, Dr. Billick concedes that the organic delirium was mild as it resolved itself fairly rapidly. (9/22/06 Tr. pg. 88, ln. 3-12). Dr. Billick explained that while the respondent recounted several facts specific to the incident, i.e. opening the window because she was hot and wrapping the baby in t-shirts, these acts were instincts "hardwired" into most women. (9/22/06 Tr. pg. 88-89). The respondent did not fully possess the executive function to process these instincts logically. Dr. Billick testified that the respondent also suffered from orthostatic hypotension which added to her dizziness immediately after giving birth. Dr. Billick testified that even if the respondent "pushed" the deceased out the window, due to the overriding organic delirium, she could not have logically processed this act. In essence, she could not have appreciated the nature and consequences of her actions or whether her conduct was wrong. (8/17/06 Tr. pg. 128-129; 9/22/06 Tr. pg. 86-87). 
Dr. Myles Schneider, testified as an expert witness on the presentment agency's rebuttal case in the fields of Child and Adolescent Psychiatry, Forensic Psychiatry and General Psychiatry. Dr. Schneider evaluated the respondent on December 9, 2005. Dr. Schneider reviewed, inter alia, the respondent's statements to the police, her psychiatric records, police reports, school records and was present in the courtroom during the testimony of the respondent's expert witness. Dr. Schneider explained that the DSM-IV-TR lists a guideline for diagnosis which requires that the most serious diagnosis be listed first. Dr. Schneider concluded based upon his understanding of the DSM-IV-TR guidelines and upon his review of Dr. Billick's evaluation of the respondent, he found that Dr. Billick listed a "major depressive disorder" as the principal diagnosis. (11/9/06 Tr. pg. 3-4).Dr. Schneider disagreed with this diagnosis since the respondent never communicated that at the time of the fatal incident she experienced the requisite daily or consistent state of depression, the [*13]diminished interest or pleasure in activities, weight loss, hypersomnia, suicide attempts and other criteria listed in the DSM-IV-TR. (9/29/06 Tr. pg. 8-17). Instead, Dr. Schneider diagnosed the respondent with a "depressive disorder" because she did not meet five of the eight criteria for a major depressive disorder. (11/9/06 Tr. pg. 36). Dr. Schneider further disagreed with what he termed Dr. Billick's secondary diagnosis of a "depersonalization disorder" because such a disorder would not cause a person to "lack substantial capacity to know or appreciate the nature and consequences of their conduct or that it was wrong." (9/29/06 Tr. pg. 21). Dr. Schneider's opinion was based on the "reality testing" of respondent's actions. Dr. Schneider further opined that there are three levels of delirium: "mild, moderate and severe." The requirements for organic delirium were not met because the respondent never communicated that she felt disorientation, language disturbance, or disturbance of consciousness although in her accounts of the time immediately after the birth she did feel dizzy and faint. Further, Dr. Schneider conceded that cardiopulmonary disorders, fluid loss, severe trauma, postoperative states, systematic illness, anemia attributed to lower hemoglobin are all contributors to organic delirium. (11/14/06 Tr. pg. 10-13). Most notable in Dr. Schneider's opinion that the respondent did not suffer organic delirium and in turn was in fact laying down memory was her ability to recall the events of the birth on numerous occasions approximately one to two days later. (11/9/06 Tr. pg. 31-33). In Dr. Schneider's opinion the respondent suffered from a "depressive disorder" which would not cause her to be unable to appreciate the consequences of her actions.
The respondent represented to Dr. Schneider that she was bleeding throughout the labor and delivery of the deceased, however, Dr. Schneider declined to expound on the respondent's exact hematocrit levels and the exact amount of blood loss and deferred those opinions to an obstetrician. To that end, the presentment agency called Dr. Ray Mercado. Dr. Mercado testified as an expert witness in the areas of Obstetrics, Gynecology and Surgery. Dr. Mercado opined that the normal amounts of fluid lost during a hospital birth is 500 cc's, which equals 100th of 1% of the entire blood fluid amount of the human body. (11/20/2006 Tr. pg. 32). Dr. Mercado explained that hematocrit levels vary based on age, gender and as in this case whether a woman or teenager was pregnant or postpartum. (11/20/2006 Tr. pg. 21-22). As such, he concluded that the respondent's hemotacrit levels were normal. Dr. Mercado conceded that ideally, a thirteen year old should receive prenatal care, fetal monitoring and a hospital assisted birth. However, based on Dr. Mercado's review of the respondent's records and her account of the birth, in his medical opinion the labor and delivery were unremarkable.
The testimony of Dr. Schneider and Dr. Mercado have properly refuted the affirmative defense raised by the respondent.Both Dr. Billick and Dr. Schneider are well qualified in the areas of child psychiatry and testified credibly. Both doctors agree that the DSM-IV-TR is the principal diagnostic manual relied upon in the psychiatric community. However, this Court is more inclined to accept the opinions of Drs. Schneider and Mercado and in turn, does not find that the respondent has met it's burden of proving the affirmative defense of mental disease or defect by a preponderance of the evidence. Dr. Billick's opinion that the respondent was not able to lay down memory is contradicted by the respondent's numerous detailed accounts to her friends, the hospital workers, the police and finally as memorialized in her videotaped statement on January 16, 2005. Notably, two days after the fatal incident. This Court rejects the theory that the respondent was creating facts to appease authority figures as opposed to communicating what actually happened.
[*14]
Dr. Billick met with the respondent for approximately two hours and did not reschedule another interview even though by his own testimony the interview was not complete. (9/22/06 Tr. pg. 63). This Court does acknowledge that Dr. Schneider met with the respondent for the same amount of time, however the interviews ended substantially different. Further, it is relevant that not one of the respondent's physicians who treated her prior to Dr. Billick's evaluation diagnosed the respondent with a "major depressive disorder." The physicians who treated the respondent on a daily basis could have diagnosed her with the same disorders that Dr. Billick found if in fact said disorders were present. This Court further questions the opinion of Dr. Billick in this particular case due to the destruction of his notes. Dr. Billick poorly attempted to distinguish child custody cases and forensic cases such as the instant matter, as a reason for the destruction of his notes. Dr. Billick is a not only a member, but also a peer reviewer and sits on the editorial board for the American Academy of Psychiatry and the Law. (9/22/06 Tr. pg. 55 and 11/9/06 Tr. pg. 13, ln. 1-9). As Dr. Schneider testified the notes are to be kept in accordance with the practice guidelines of the American Academy.This Court does not find the quality, weight and convincing effect of Dr. Billick's testimony to be outweighed by the contradicting testimony of both Dr. Schneider and Dr. Mercado. Thus, there has not been sufficient testimony of a mental disease or defect to establish by a preponderance of the evidence that the respondent lacked the capacity to know or appreciate the consequences of her actions or that she did not know her actions were wrong.
Although not specifically argued by the respondent, pursuant to C.P.L. 250.10(c), the psychiatric evidence presented was also considered as to any other defense that may negate mens rea.C.P.L. 250.10(c) states in pertinent part: the term "psychiatric evidence" means: . . . evidence of mental disease or defect to be offered by the defendant in connection with any other defense . . ." The presentment agency proved beyond a reasonable doubt each element of P.L. 125.25(2). This Court has evaluated the relevant testimony in light of Suarez and the litany of cases that established depraved indifference as a culpable mental state and holds that the respondent has not sufficiently established by a preponderance of the evidence any other defense. CONCLUSION
Based on the foregoing, and after careful consideration of all testimony and relevant evidence submitted in the instant case, this Court does not find that the respondent has proven the affirmative defense of mental disease or defect pursuant to P.L. § 40.15 so as to negate the mens rea of depraved indifference to human life. The parties requested the consideration of lesser included offenses, in light of Suarez and it's progeny, this court does not enter a finding as to any lesser included offenses. As such, this Court enters a finding as to the only count on the petition against the respondent to P.L. 125.25(2).
This constitutes the decision of the court.
Dated: December 11, 2006ENTER
_______________________________
Hon. Nelida Malave-Gonzalez, J.F.C.

Footnotes

Footnote 1: The respondent waived speedy trial on May 18, 2005. In addition, there have been many issues surrounding public access to the courtroom that led to the delay of fact-finding hearing. 

Footnote 2:A.M.P., K.P and L.B. are all juveniles as such initials are used to protect their identity and to preserve the respondent's anonymity.

Footnote 3: A.M.P. met her mother on the street. 

Footnote 4: J.L. is also a juvenile and as such initials are used to protect her identity and to preserve the respondent's anonymity. 

Footnote 5: Other detectives and police officers also went to the apartment but remained outside the apartment and secured the perimeter of the building. 

Footnote 6:A Huntley hearing on the admissibility of respondent's statements was held by the Hon. Monica Drinane, Bronx Family Court and suppression was denied.

Footnote 7: The deceased was born at approximately 7 months.

Footnote 8: On appeal the defendant asserted that "depraved indifference" as it applies to reckless conduct was a mental state which could be mitigated by his intoxication. The Court of Appeals rejected this reasoning.

Footnote 9: A person is guilty of reckless endangerment in the second degree when he recklesslyengages in conduct which creates a substantial risk of serious physical injury to another person. P.L.§ 120.20.

Footnote 10: To clearly establish depraved indifference as a culpable mental state similar to intentor knowledge, the Feingold Court further held that depraved indifference has the same meaning in the context of reckless endangerment and depraved indifference murder. 

Footnote 11: Dr. Luther also took part in the interview but did not individually generate any reports nor did he testify at the fact finding hearing. 

Footnote 12: DSM-IV-TR is the Diagnostic Statistical Manual 4th Edition Text Revised. 

Footnote 13: Dr. Billick testified that an average hematocrit level is approximately forty. 

Footnote 14: Respondent had surgery to correct this defect on October 7, 2005.